**The PEOPLE of the State of Colorado, Complainant,**

v.

**Jerry E. QUICK, Attorney-Respondent.**

**No. 85SA155.**

Supreme Court of Colorado, En Banc.

Jan. 31, 1986.

Linda Donnelly, Disciplinary Pros., George S. Meyer, Deputy Disciplinary Pros., Denver, for complainant.

Zarlengo, Mott and Zarlengo, Reed L. Winbourn, Denver, for attorney-respondent.

LOHR, Justice.

In this grievance proceeding, the disciplinary prosecutor filed a formal complaint against the respondent, Jerry E. Quick, charging him with eight counts of professional misconduct. The respondent and the disciplinary prosecutor entered into a Stipulation, Agreement, and Conditional Admission of Misconduct in which the respondent admitted the essential facts contained in the eight counts of the complaint. The parties jointly recommended that the respondent be disbarred from the practice of law and be required to make restitution to his former clients for money they lost as a result of the respondent's professional misconduct. The respondent agreed to pay the costs of this grievance proceeding. The respondent also requested that the period of his disbarment be measured from May 6, 1982, the date on which he previously was suspended from the practice of law. An inquiry panel of the grievance committee approved the stipulation but recommended denial of respondent's request that the period of his disbarment be measured from May 6, 1982. We agree with the recommendations of the inquiry panel.

The respondent was admitted to the bar in Colorado on October 4, 1966, and is registered as an attorney upon the records of this court. He therefore is subject to the jurisdiction of this court and of the grievance committee with respect to his conduct as an attorney. The following stipulated facts describe the professional misconduct on which the respondent's disbarment is based.

### Theft of Client's Money

In December 1980, the respondent agreed to represent Lowell Seberson and Marvin Williams in the sale of their restaurant in La Junta, Colorado. The respondent misrepresented to Seberson and Williams that the title company involved in the sale required $20,000 to be placed in escrow. Seberson and Williams gave the respondent a check for that amount. The respondent told them that he would deposit the check into an interest-bearing account and that the money would "come back to [them] within a year under [a] wrap-around mortgage arrangement." The respondent then deposited the money into his own checking account.

Approximately one year later, Seberson inquired about the money. The respondent misrepresented to him that the money had been placed in a trust account and should remain there until an alleged certificate of deposit matured. In February of 1982, the respondent admitted to Seberson that he had spent the $20,000. These activities resulted in the respondent's conviction in 1983 of felony theft. See § 18-4-401, 8 C.R.S. (1978). We affirmed this conviction

today in *People v. Quick*, 713 P.2d 1282 (Colo.1986).[1]

The stipulation recognizes that the respondent's conduct in this matter violated DR1–102(A)(1) (violating a disciplinary rule), DR1–102(A)(3) (engaging in illegal conduct involving moral turpitude), DR1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), DR1–102(A)(6) (engaging in conduct that adversely reflects on fitness to practice law), DR7–101(A)(2) (intentionally failing to carry out a contract of employment), DR7–101(A)(3) (intentionally damaging a client), and DR9–102(B)(4) (failing to promptly pay or deliver client's property to client), and therefore grounds for discipline exist under C.R.C.P. 241.6(1) (any act or omission that violates the provisions of the Code of Professional Responsibility), C.R.C.P. 241.6(3) (any act or omission that violates the highest standards of honesty, justice, or morality), and C.R.C.P. 241.6(5) (any act or omission that violates the criminal laws of Colorado).

### Misrepresentations Concerning Deed of Trust

In December 1980, the respondent agreed to purchase real property owned by Helen Cowan Cox and James Cowan. The respondent paid Cox and Cowan $15,284 in cash and gave them a promissory note for $26,000, representing the balance of the purchase price, and a deed of trust securing the note. The respondent told Cox and Cowan that he would record the deed of trust so as to provide Cox and Cowan with a first lien on the property. Before he recorded the deed of trust, however, the respondent obtained a bank loan, also secured by a deed of trust on the property. The bank promptly recorded its deed of trust, but the respondent neglected to record the deed of trust held by Cox and Cowan until several weeks later. When the respondent became delinquent in his loan payments to the bank, the bank began foreclosure proceedings, claiming a first

lien on the property. In response to requests by Cox and Cowan that the respondent satisfy the $26,000 note, the respondent stated that he was trying to sell the property in order to pay off the note. The respondent did sell the property but did not pay any money to Cox and Cowan.

The stipulation recognizes that these actions by the respondent violated DR1–102(A)(1) (violating a disciplinary rule), DR1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and DR1–102(A)(6) (engaging in conduct that adversely reflects on fitness to practice law), and therefore grounds for discipline exist under C.R.C.P. 241.6(1) (any act or omission that violates the provisions of the Code of Professional Responsibility) and C.R.C.P. 241.6(3) (any act or omission that violates the highest standards of honesty, justice, or morality).

### Misrepresentations Regarding Foreclosure of Farm Property

In approximately July 1979, Ida Mae and Ben Marquez met with the respondent to discuss the difficulty experienced by Mr. and Mrs. Marquez in making the mortgage payments on a $675,000 farm-equipment loan that they had obtained from Prudential Life Insurance Company. The respondent offered to manage or sell their farm at a profit or to obtain additional financing. In mid-1981, the respondent arranged for one of his business clients, Bill O'Brate, to purchase the land and the machinery in exchange for cash to be paid in the future and for O'Brate's promise to satisfy the debts of Mr. and Mrs. Marquez, including the Prudential loan. The respondent then prepared a sales agreement which provided in part that

> Buyer is not assuming and agreeing to pay any indebtedness on the property but takes all of the property subject to said indebtedness and agrees that if the buyer does not pay any such indebtedness,

**1.** The foregoing facts vary in some respects from those recited in our opinion in the criminal case. The variances are based on differ-
ences between the stipulation in the present disciplinary matter and the record in the criminal case.

then all of the subject property will be reconveyed to the sellers with no additional liens or interest attaching to the subject property.

In July 1981, Mr. and Mrs. Marquez signed the sales agreement and transferred the land and the machinery to O'Brate by warranty deed and bill of sale. They believed, in reliance upon representations made to them by the respondent, that this sale would preclude foreclosure of the property. On November 20, 1981, however, Prudential began foreclosure proceedings on the land and the machinery, claiming that Mr. and Mrs. Marquez had failed to make their mortgage payments when due, that they had failed to pay all taxes before the taxes became delinquent, and that they had abandoned the property. After foreclosure, Mr. and Mrs. Marquez were unable to redeem the property.

The respondent's conduct in this matter violated DR1–102(A)(1) (violating a disciplinary rule), DR1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), DR1–102(A)(6) (engaging in conduct that adversely reflects on fitness to practice law), DR5–105(B) (continuing employment by multiple clients who have differing interests), DR7–101(A)(2) (intentionally failing to carry out a contract of employment), and DR7–101(A)(3) (intentionally prejudicing or damaging client), and thus grounds for discipline exist under C.R.C.P. 241.6(1) (any act or omission that violates the provisions of the Code of Professional Responsibility) and C.R.C.P. 241.6(3) (any act or omission that violates the highest standards of honesty, justice, or morality).

### Representation of Multiple Clients with Adverse Interests

In October 1978, James Rafferty retained the respondent for assistance in handling the financial difficulties Rafferty and his pipe-trenching company were experiencing in making payments to creditors. The respondent suggested that Rafferty either file for bankruptcy or arrange for new financing for the company. Rafferty chose the second option. The respondent suggested obtaining financing from investors who could purchase Rafferty's trenching equipment and then lease it back to his company. In this regard, the respondent met with Grant Walter, one of Rafferty's creditors.

Walter and the respondent proposed the formation of a corporation, to be called Walter Trenching, which would purchase Rafferty's machinery. Under the terms of the final agreement, Walter was to loan the corporation enough money to satisfy Rafferty's debts at La Junta State Bank and was to establish a line of credit at the bank for the operation of the corporation's business. In return, Walter was to receive the tax benefits generated by the enterprise. Rafferty was to operate the firm's machinery, bid the trenching jobs, and schedule the corporate business.

Mr. and Mrs. Walter and the respondent, as Rafferty's agent, received all the shares of Walter Trenching. The respondent was appointed secretary and treasurer of the corporation and served as the corporation's counsel. Rafferty delivered his cash and his accounts receivable to the respondent who was to use them to satisfy Rafferty's remaining creditors. The respondent told Rafferty that at the end of seven years, Rafferty would be given the opportunity to repurchase the trenching machinery with a loan from the corporation.

Although the La Junta State Bank indebtedness was satisfied, Rafferty's other creditors were not paid and no line of credit was established for the corporation. After Rafferty expressed his displeasure with the respondent's failure to satisfy the outstanding debts, the respondent transferred to Walter the shares he held for the benefit of Rafferty. Approximately eighteen months later, a creditor sued Rafferty. The respondent refused to assist Rafferty with this lawsuit, stating that a conflict of interest prevented him from continuing to represent Rafferty. The respondent suggested that Rafferty file for bankruptcy.

The stipulation correctly concludes that the respondent's conduct in the Rafferty matter violated DR1–102(A)(1) (violating a

disciplinary rule), DR1–102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), DR1–102(A)(6) (engaging in conduct that adversely reflects on fitness to practice law), DR5–101 (accepting employment when the interests of the lawyer may affect his independent professional judgment), DR5–104 (engaging in improper business relations with a client), DR5–105(B) (continuing employment by multiple clients who have differing interests), DR6–101(A)(3) (neglecting a legal matter entrusted to the lawyer), and DR7–101(A)(3) (intentionally prejudicing or damaging client), and therefore grounds for discipline exist under C.R.C.P. 241.6(1) (any act or omission that violates the provisions of the Code of Professional Responsibility) and C.R.C.P. 241.6(3) (any act or omission that violates the highest standards of honesty, justice or morality).

### Failure to Respond to Informal Complaint

The remaining four counts in the stipulation concern the fact that the respondent failed to respond to informal complaints filed against him by Seberson, Cox and Cowan, Ida Mae Marquez, and Rafferty. The respondent's misconduct in this regard violated C.R.C.P. 241.6(7) (failure to respond to a request by the Grievance Committee without good cause).

The respondent has not received prior discipline by either the Grievance Committee or by the Colorado Supreme Court. However, on May 6, 1982, he was suspended from the practice of law on an interim basis. He has remained suspended to the present and has been placed on temporary disability inactive status. He requests that the period of his disbarment be measured from May 6, 1982, the date of his suspension, but does not condition his stipulation on agreement to that request. We believe, however, that the seriousness of the misconduct in this case would make it inappropriate to honor that request.

In approving the recommended discipline, we are aware that the respondent was diagnosed as suffering from a serious mental disorder that adversely affected his ability to function appropriately as a lawyer when his professional misconduct occurred. This is detailed in our opinion today in *People v. Quick*, 713 P.2d 1282 (Colo.1986), and is corroborated by opinions of mental health professionals appearing in the record of the case now before us. The parties, however, do not allude to that matter in their stipulation and recommendation for disbarment. Under these circumstances, and given the severe adverse effect of the respondent's activities on his clients, we are willing to accept that disbarment is the appropriate consequence of the respondent's misconduct.

The respondent, Jerry E. Quick, is disbarred from the practice of law. His disbarment shall be measured from the date of this opinion. In accordance with the stipulation, the respondent is ordered to restore the $20,000 taken from Lowell Seberson and Marvin Williams and the $26,000 owed to Helen Cowan Cox and James Cowan, and is further to restore to James Rafferty any amounts of Rafferty's assets not applied as the respondent had promised. As agreed in the stipulation, the respondent shall pay the costs of this proceeding in the amount of $1,328.50 to the Colorado Supreme Court Grievance Committee, Dominion Plaza Building, 600 17th Street, No. 500–S, Denver, Colorado 80202 within thirty days from the date of this opinion.